**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.                                                          No. 97-4449

JOHN H. PAYNE, JR.,
Defendant-Appellant.

Appeal from the United States District Court
for the Western District of Virginia, at Big Stone Gap.
Glen M. Williams, Senior District Judge.
(CR-96-53-B)

Argued: March 6, 1998

Decided: June 24, 1998

Before NIEMEYER, HAMILTON, and LUTTIG, Circuit Judges.

_____

Affirmed by unpublished per curiam opinion.

_____

**COUNSEL**

**ARGUED:** William Thomas Dillard, RITCHIE, FELS & DILLARD,
P.C., Knoxville, Tennessee, for Appellant. Steven Randall Ramseyer,
Assistant United States Attorney, Abingdon, Virginia, for Appellee.
**ON BRIEF:** Ruth T. Ellis, RITCHIE, FELS & DILLARD, P.C.,
Knoxville, Tennessee, for Appellant. Robert P. Crouch, Jr., United
States Attorney, Abingdon, Virginia, for Appellee.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

Defendant John H. Payne, Jr., was convicted in the Western District of Virginia of perjury under 18 U.S.C. § 1623(c) for knowingly making, under oath, "two or more declarations, which [we]re inconsistent to the degree that one of them is necessarily false," and which were material to the proceedings in which they were made. Id. The jury found that Payne "made irreconcilably contradictory declarations," id., when he testified in one proceeding, in essence, that he had loaned his friend, Henry Stanley Hayes, $60,000 and that Hayes had repaid $56,000 of that loan, and then testified in a subsequent proceeding that, although the money for the $60,000 loan literally sat on the table, Hayes could not produce the requested collateral and therefore Payne never gave him any of the money. When questioned by an FBI officer about these contradictions in his testimony, Payne was unable to explain them. J.A. at 45.

Nevertheless, Payne challenges the sufficiency of the evidence for his conviction by arguing to this court -- as he argued to the jury -- that his statements were not irreconcilably contradictory because there were actually two separate loan transactions of around $60,000, one of which was consummated and one of which was not, and that he was talking about a different transaction in the first court proceeding than in the second. There is no suggestion in Payne's testimony at either proceeding, however, that Payne had made (or offered to make) two $60,000 loans to Hayes. In fact, Payne not only failed to mention the existence of two such loans at any of the critical junctures in his testimony at which he would naturally have offered that information, he also implied that no other $60,000 loan existed. Thus, a rational jury could certainly have found, as the jury in this case did, that Payne was talking about the same transaction in both court proceedings, and

2

that his statements about that transaction were irreconcilably contradictory. The judgment below is therefore affirmed.*

On October 20, 1994, Payne testified in the Western District of Virginia at the sentencing hearing of his "old friend," Hayes, J.A. at 34-35, who had been convicted of fraudulently offering to sell government vehicles that he did not own. J.A. at 43. Payne's testimony was apparently offered for the purpose of explaining where the proceeds of Hayes' fraudulent scheme had gone. When asked whether he had loaned Hayes any money, Payne testified that he had, and when asked how much he had loaned Hayes, Payne testified that he had "loaned [Hayes] six notes, ten thousand dollars each." J.A. at 288. Payne was also asked whether "Mr. Hayes pa[id him] back sixty thousand dollars," and Payne testified that "[Hayes] paid it all back except four thousand." J.A. at 290. Specifically, Payne testified that Hayes paid him back -- mostly with cashier's checks-- in "December and January, December of '93, January of '94, and the last payment was made probably late March. He paid six thousand dollars on this last note." Id. On cross-examination, Payne confirmed that Hayes had paid him back $56,000 in 1994. J.A. at 293.

_____

*Contrary to defendant's assertion, the prosecutor adequately identified which statements were inconsistent in his opening statement. J.A. at 26-32. Additionally, the indictment adequately alleged the offense with which defendant was charged. Defendant has challenged the sufficiency of his indictment because, while the indictment charged that he had made inconsistent statements in the identified proceedings "concerning loans to Henry Stanley Hayes and payments from Henry Stanley Hayes," J.A. at 7-8, it did not specifically identify which statements in those proceedings were inconsistent. Payne first challenged his indictment post-trial, and thus the indictment is liberally construed and "every intendment is . . . indulged in support of [its] sufficiency," Finn v. United States, 256 F.2d 304, 307 (4th Cir. 1958) (holding that "[i]ndictments and informations are construed more liberally after verdict than before" because after trial it is "too late" for the government to cure any defect "by a simple amendment"). Because the indictment gave fair notice to Payne of the charges against him and would enable him "to plead double jeopardy in defense of future prosecutions of the same offense," United States v. Sutton, 961 F.2d 476, 479 (4th Cir. 1992), the indictment is clearly sufficient. Moreover, the indictment adequately established venue in the Western District of Virginia, and venue there was proper because one of the inconsistent statements was made in a sentencing hearing in that district.

3

One of the victims of Hayes' fraudulent scheme then instituted involuntary bankruptcy proceedings against Hayes in the Eastern District of Tennessee. Seeking to recover as much of Hayes' money as possible to permit equitable distribution to Hayes' many creditors (most of whom were victims of his scam), the bankruptcy trustee filed an adversary proceeding against Payne -- based on Payne's testimony at the sentencing hearing -- to recover as voidable preferences those payments that Payne had testified Hayes made to him during 1994. J.A. at 49-50. Thus, if Payne testified in the bankruptcy proceedings that Hayes had repaid him more than $50,000 of a $60,000 loan, he risked being forced to disgorge that money to the bankruptcy estate and recovering only a small percentage of that money in the equitable distribution.

At his August 11, 1995, bankruptcy deposition in the Eastern District of Tennessee, Payne was asked specifically about the $60,000 loan to Hayes:

> Q[uestion]: One of the things Mr. Hayes has testified to is -- he has told us he executed six, ten thousand dollar notes with you, is that correct?
>
> A[nswer]: Probably.
>
> Q[uestion]: He was unable to tell the time frame, but the way he was describing it, it was in the latter part of the nineties, most recent time, is that correct?
>
> A[nswer]: Probably, yeah.

J.A. at 229. When asked how the notes arose, Payne testified that "[t]hey was two or three timing frames there and I can't -- I'll have to get that telephone thing, because he was trying to build a fire log, like you burn in a fireplace." J.A. at 231. He also explained that "these borrowings" "were going to purchase an extrusion machine for the fire log which packs it, squirts it out . . . . And that's what the loan money came up about on that." J.A. at 232. Payne further testified that a "UCC-1" on the extrusion machine was to serve as collateral for the loan. J.A. at 232-33.

4

Payne was then asked "[D]id you ever actually loan him sixty thousand dollars?" J.A. at 233. Payne replied, "Well, the money sat on the table, but he didn't get it until he got the machine." J.A. at 233. The questioner then attempted to clarify Payne's response, and Payne confirmed that Hayes had never actually received any of the $60,000:

> Q[uestion]: So let's go back now. When you say the money sat on the table, did you physically have sixty thousand dollars in cash, check or anything on the table for him to see?
>
> A[nswer]: Yeah.
>
> Q[uestion]: You actually had it?
>
> A[nswer]: Yeah.
>
> Q[uestion]: Did he get it?
>
> A[nswer]: No, he wouldn't produce the machine. I told him without a UCC-1 filed, we'd just quit right there. And when we quit was about the time he brought that first cashier's check in on me. And that is when he got the notes back.
>
> Q[uestion]: So he never -- did he sign the notes?
>
> A[nswer]: He signed the notes.
>
> Q[uestion]: But he never really got the money from it, is that right?
>
> A[nswer]: Right.

J.A. at 233-34. Upon further questioning, Payne confirmed yet again that, although Hayes had signed the six, ten thousand dollars notes, Hayes never got the money and Payne gave the money back to his own children. J.A. at 235.

5

In a telling exchange, Payne was then asked, "So when Mr. Hayes says that all but five thousand dollars of <u>that</u> sixty thousand dollars was repaid, he's mistaken. None was really repaid, because none was really loaned, is that right?" J.A. at 236 (emphasis added). Rather than explaining that Hayes was not in fact mistaken, but was simply talking about a <u>different</u> $60,000 transaction, Payne replied, "Basically." <u>Id</u>. The questioner then pinned Payne down on that response:

> Q[uestion]: What is wrong about that statement?
>
> A[nswer]: Well, nothing. The other money come from me; it didn't come out of the kids' money.
>
> Q[uestion]: Was there some other money in addition to the sixty?
>
> A[nswer]: I had loaned him four thousand dollars.
>
> Q[uestion]: He still owes you for that, is my understanding?
>
> A[nswer]: Yes.

<u>Id</u>.

Thus, when asked whether there was other money -- in addition to the $60,000 that sat on the table -- Payne testified only about the separate $4,000 transaction, and did not mention a separate $60,000 loan. Moreover, Payne specifically confirmed that the only money that he had loaned Hayes was that four thousand dollars, various small amounts for poker and gambling debts that Hayes would request late at night from Payne -- who worked nights near the club where Hayes gambled -- J.A. at 228, and some invoices on goods Payne sold to Hayes that Hayes did not pay up front:

> Q[uestion]: So as I understand your testimony, the only real monies you gave to him, in terms of a loan was the four thousand dollars and various borrowings for his poker debts or gambling debts?

6

A[nswer]: Yeah, and then I was -- there is one of those invoices in there he didn't pay up front.

J.A. at 237. Payne did not so much as suggest the existence of any separate $60,000 loan.

And, again, when Payne was asked why Hayes would have testified in his sentencing hearing that Payne had loaned Hayes $60,000 dollars (and that Hayes had paid $55,000 back to Payne) while Payne was testifying in the bankruptcy proceeding that the $60,000 was never actually loaned, Payne did not explain that he and Hayes were talking about two different $60,000 transactions. Instead, Payne suggested that the reason Hayes had said that he paid $55,000 back to Payne on a $60,000 loan was so that Hayes would not have to explain where the proceeds from his scam had gone:

Q[uestion]: Why would he say -- can you think of any reason why he would say he borrowed sixty thousand from you and paid all of it back but fifty-five thousand?

A[nswer]: Sure.

Q[uestion]: Why?

A[nswer]: Because of all those invoices. He's bought all of that stuff, and he used them to pay for that.

Q[uestion]: You think that is why he thinks he's borrowed sixty thousand from you?

A[nswer]: No, the reason it is is he don't want to have to explain where all that went.

J.A. at 238.

A jury could certainly find from the foregoing testimony that Payne was discussing only one $60,000 transaction at the sentencing hearing and during the bankruptcy proceedings, and that Payne made irreconcilably contradictory statements about that transaction. Thus, we affirm the judgment below.

AFFIRMED

7